No. 619　　　　　July 1, 2026　　　　　189

***This is a nonprecedential memorandum opinion
pursuant to ORAP 10.30 and may not be cited
except as provided in ORAP 10.30(1).***

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TIMOTHY EUGENE LUKEHART,
*Defendant-Appellant.*

Lane County Circuit Court
21CR55436; A181278

Charles M. Zennaché, Judge.

Submitted February 12, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Zachary Lovett Mazer, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

PAGÁN, J.

Convictions on Counts 1 through 12 and 14 through 16 reversed and remanded; otherwise affirmed.

**PAGÁN, J.**

This appeal concerns defendant's judgment of conviction for animal abuse (Count 1), physical abuse (Count 2), and multiple counts of sexual abuse (Counts 3-12, 14-16).[1] Defendant asserts nine assignments of error in five categories: (1) denial of his motion to sever the animal abuse count; (2) admission of his adult daughter's testimony about the shape of his penis despite his OEC 403 objection; (3) admission of his mother's testimony on a collateral matter; (4) plain error in allowing impermissible vouching by the prosecutor in closing argument; and, (5-9) failure to merge the guilty verdicts of sexual abuse for Counts 5, 6, 7, 9, and 11. We agree with defendant that the trial court plainly erred by allowing improper vouching during the state's closing arguments, and thus we reverse and remand. However, because defendant's first and second assignments are likely to arise again on remand, we address them now and affirm the trial court's rulings on those assignments of error.

## I.   BACKGROUND

The issues in this case come before us in several procedural postures, and therefore the standard of review for each set of issues is more completely presented in the analysis below.

### A.   *Family Background*

The material facts of defendant's family background are uncontested. At the time of the charged crimes, defendant was married to K, whom he first met when she was 9 and who became friends with defendant's daughter. They were married in a religious ceremony in 2011 when K was 17. Defendant and K had four children together, the oldest of which was their daughter M, who was born in 2012. In September of 2021, K left defendant, taking the children with her, and went to the police because she was worried defendant would try to take the children from her, which led to the investigation that resulted in the charges underlying these proceedings.

---

[1] The court entered a judgment of acquittal, finding defendant "Not Guilty" of Count 13, sexual abuse in the first degree.

B.  *Death of Blue*

Defendant and the state presented differing accounts of the events that led to the death of the dog named Blue. The state's theory, built on testimony from K, the investigating officer, and statements from M's forensic interview, was that defendant tried to breed Blue with another of his dogs, and when the breeding failed, he first tried to strangle her by hanging her with a rope, and when that did not kill her, he trapped her in a box where she died over the course of a few days. In contrast, defendant testified that Blue had tried to get out of the yard and partially strangled herself on the rope leash, and that defendant put her in the box (but did not trap her) and gave her fluids until she died from her injury.

C.  *Physical Abuse*

The parties agree that defendant physically disciplined M, but the parties disagree on the extent and severity of that discipline. The state's witnesses testified that defendant sometimes used a willow stick to spank M and sometimes left painful yellow and red welts on her legs and buttocks that lasted for at least a day. Defendant testified that his discipline never left a lasting mark and was equivalent in severity to the discipline administered by his wife or older, adult children.

D.  *Sexual Abuse*

The bulk of the charges against defendant were for the sexual abuse of M. The state built its case on M's forensic interview. In that interview, M described a long period of sexual abuse, saying that defendant would make her take off her pants and underwear, and then defendant would touch her vagina with his finger or penis, sometimes would make her touch his penis with her hand, and one time made her put her mouth on the end of his penis. She stated that the touching happened multiple times in her room, in the living room, in the backyard shed, and on defendant's bed. She said defendant would sometimes show her videos of naked people while he touched her. She said that sometimes defendant put his finger in her anus or tried to put his penis in her anus but stopped when she said it hurt. She said that one time he tried to put his penis in her vagina but again stopped when she said it hurt.

Defendant denied engaging in any sexual conduct towards M.

E.   *Police Investigation*

When K took the kids and left defendant, she contacted the police. Over the next few days, she spoke with police, reporting physical abuse against the children and eventually telling them about animal abuse against Blue. Potential animal abuse was added to the police's investigation of physical abuse against the children. The police scheduled a forensic interview at KIDS First for M to discuss potential physical abuse she had experienced and what she had witnessed regarding defendant's treatment of Blue. The night before the interview, M disclosed to K that defendant had also sexually abused her. During the forensic interview the following day, M told the interviewer about how she helped defendant put Blue in the box and stated that she could sometimes hear Blue whining inside the box when she went to the garage to spend time with defendant. She also described her experiences of physical discipline and disclosed an extensive period of sexual abuse by defendant.

F.   *Procedural History*

Defendant was indicted by a grand jury for one count of aggravated first-degree animal abuse (Count 1), ORS 167.322; one count of first-degree criminal mistreatment (Count 2), ORS 163.205; eight counts of first-degree sexual abuse (Counts 3-7, 9, and 11-13), ORS 163.427; three counts of first-degree sodomy (Counts 8, 10, and 15), ORS 163.405; one count of first degree unlawful sexual penetration (Count 14), ORS 163.411; and one count of first-degree rape (Count 16), ORS 163.375.

Before trial, defendant opposed joinder of the charge of animal abuse with the charges of abuse against M by demurrer. The court denied the demurrer and the charges were joined. Defendant filed a motion to sever shortly thereafter. The motion was denied.

During trial, defendant testified that his mother had signed him up for the army, and the statement was impeached by testimony from his mother saying that she

had not done so. Defendant objected on OEC 608(2) grounds, claiming that his mother should not be permitted to testify to a specific example of untrustworthy character. The trial court overruled the objection.

An important part of defendant's trial strategy was to discredit M's testimony by offering evidence that defendant had a noticeable hernia on his groin and an extreme bend in his penis, arguing that the fact that M did not mention either of those things suggested that she never actually felt or was exposed to defendant's penis. K testified that defendant's penis was normal, but the state also called defendant's adult daughter to testify that she had felt her father's penis 20 years before, when she would have been 10, and that it did not have a bend in it. Defendant objected to that testimony under OEC 403, arguing that the unfair prejudice of the adult daughter's testimony substantially outweighed its probative value. The court allowed the jury to hear the adult daughter's testimony but first provided a limiting instruction stating that the jury was to use her testimony regarding the shape of defendant's penis for the limited purpose of determining if defendant's penis was bent and for no other purpose.

During the state's closing argument, the prosecutor repeatedly referred to defendant's testimony and version of events as "lies." Defendant did not object to those statements at trial.

The court granted defendant's motion for a judgment of acquittal on Count 13, and defendant was found guilty and convicted on all other counts. At sentencing, the trial court chose not to merge Counts 5, 6, 7, 9, and 11, finding that the instances of conduct underlying each count happened during different episodes. Defendant timely appealed.

## II.   ANALYSIS

### A.   *Prosecutor's Comments During Closing Argument*

Defendant claims that the trial court plainly erred by permitting the prosecutor to engage in impermissible vouching during closing argument. We are persuaded by that argument.

If the defendant, as here, did not object to the purported vouching at trial and is challenging it for the first time on appeal, we are limited to reviewing for plain error. ORAP 5.45(1). The Supreme Court has addressed in some detail when prosecutorial misconduct in closing argument rises to the level of reversible plain error. As we have summarized:

> "For statements in closing argument to rise to the level of reversible plain error, it must be 'beyond dispute' that they 'were so prejudicial as to have denied defendant a fair trial.' *State v. Chitwood*, 370 Or 305, 312, 518 P3d 903 (2022) (internal quotation marks omitted). To meet that standard, the statements, individually or collectively, must have been both obviously improper *and* incurable. *State v. Perez*, 373 Or 591, 606, 568 P3d 940 (2025). A statement is obviously improper if its only possible interpretation makes it an impermissible remark, whereas a statement is not obviously improper if it is susceptible to more than one interpretation, at least one of which is not impermissible. *Id*. at 607. If a statement was obviously improper, we must next consider whether it would have been curable or, conversely, whether it was so egregious as to require a mistrial as a matter of law, with only statements in the latter category qualifying as plain error. *Id*. at 605. If a statement was not obviously improper, we need not reach the issue of curability. *Id*. at 615."

*State v. Avendano*, 346 Or App 16, 18, 583 P3d 1080 (2025) (emphasis in original).

The prosecutor "has a large degree of freedom to comment on the evidence submitted and urge the jury to draw any and all legitimate inferences from that evidence" during closing argument. *State v. Montgomery*, 327 Or App 655, 660, 536 P3d 627 (2023), *rev den*, 371 Or 825 (2024). "[P]arties often bolster the credibility of their witnesses indirectly and implicitly through the presentation of corroborating evidence." *State v. Charboneau*, 323 Or 38, 47, 913 P2d 308 (1996). "[C]ounsel may argue that the jury should regard a witness as credible (or not) based on, for instance, the witness's demeanor and testimony" or other evidence; however, counsel may not express a personal opinion of a witness's credibility. *State v. Sperou*, 365 Or 121, 135, 442 P3d 581 (2019) (emphasis omitted).

Here, during closing arguments, the prosecutor described defendant's testimony and version of events as "lies" 29 times during his initial closing statement and an additional nine times during his closing rebuttal. Many of those statements were not tied to arguments comparing defendant's statements to contradictory evidence or the statements were simply arguments that because defendant's statements contradicted what another witness said, defendant's statements were lies. For example, the prosecutor stated,

"When I asked him questions, it was extremely hard to just get him to ask—answer simple questions, yes or no. But more importantly, his entire testimony was riddled with *falsehoods and lies*. And he essentially gaslit this entire courtroom.

"What I mean by that is, he tells lies, and then he tells more lies to cover up that lie. And what happens is you start losing your footing. Because if he lies to you and you challenge that lie, then he tells four or five more lies to explain that first one about how maybe—okay, maybe it's not quite a lie, it's just a misunderstanding, but it's impossible to ever corner him because he tells stories, makes speeches that are filled with additional lies."

Those statements by the prosecutor did not relate to any piece of evidence, they solely communicated the prosecutor's belief that defendant was a liar and that his version of events was full of lies.

The prosecutor acknowledged at the beginning of his closing argument that this case came down to a credibility contest between witnesses, saying, "And if you [the jury] believe [M], that is sufficient to prove every charge in this case, if you believe her." The prosecutor also frequently labeled defendant's version of events as "lies." One illustrative example was when the prosecutor stated:

"He lies about who's responsible for the spanking. Trying to save [*sic*] it was [K]'s—all about [K]. He lies about how many times he struck [M]. He lies about what he used to strike [M], trying to say that the willow stick was just a fire poker. And he lies about the marks that he would leave on [M's] body.

"All of those lies serve one purpose, and that is to try and say, 'I used reasonable force just like anyone would, just some light swats, and everything else is untrue.' But it's his lies that also demonstrate the consciousness of guilt. He's conscious of what he did and how wrong it was. And so he's lying to try and say no, it wasn't that bad."

The only other evidence in the record about who was responsible for the spanking and how it was carried out were other witnesses, and thus it was the prerogative of the jury to conclude whose testimony they believed.

The prosecutor's statements here are not materially distinguishable from the statements we concluded were impermissible vouching in *State v. Montgomery*, 327 Or App at 660-62. In that case, during closing argument, the prosecutor made a similar statement to the one above, which we concluded constituted vouching, stating, "So she says—or he says that [the victim] touched his back and gave him a look. *First of all, that's a lie*. She testifies to nothing like that." *Id.* at 658 (brackets and emphasis in original; internal quotation marks omitted). Like the prosecutor here, the prosecutor in *Montgomery* asserted to the jury that the defendant's testimony was a lie based solely on the fact that it contradicted the testimony of the state's witness. *Id.* We concluded that that statement and other similar ones intruded upon the role of the jury to determine which version of events was most credible, and as a result, "the jury might have been tempted to evaluate the witnesses' credibility on that basis rather than on the evidence." *Id.* at 660.

The state in contrast argues that the prosecutor's arguments were not problematic in context and thus could not be said to be plain error. *See State v. Putnam*, 340 Or App 61, 64, 569 P3d 1014, *rev den*, 374 Or 188 (2025) (rejecting plain-error vouching argument where the prosecutor's challenged statements "were not problematic in context," as they did "not suggest that the prosecutor was sharing her own view of the witness's truthfulness; rather, the prosecutor was arguing that the victim was credible based on her testimony and other evidence"). We find this argument unpersuasive. This was a case that turned on credibility. Repeatedly characterizing defendant's account of events as

"lies" solely because it differed from the testimony of the state's witnesses inserts the prosecutor's own credibility judgment into the argument and usurps the jury's role as the arbiter of credibility.

Having determined that the statements were obviously improper, we next conclude that the error was not curable and was so egregious as to require a mistrial as a matter of law. This case turned entirely on credibility, on whether the jury believed M and the state's witnesses, or if it believed defendant. The prosecutor's repeated interjection of his personal opinion that defendant's testimony was full of lies thus might have tempted the jury to resolve the credibility issue—and by extension the entire case—on an improper basis. Those were the same considerations that led us to conclude that the prosecutor's statements were plain error in *Montgomery*, and so we come to the same conclusion here and exercise our discretion to correct the plain error. *See Montgomery*, 327 Or App at 661-62.

When determining whether to exercise our discretion, we consider relevant factors such as "the competing interests of the parties; *** the gravity of the error; [and] the ends of justice in the particular case ***." *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991). Here, defendant was sentenced to 1,650 months in prison, meaning he faces spending the rest of his life incarcerated. Additionally, the vouching was repeated and emphasized throughout the state's closing argument, with the word "lie" or "lies" appearing to characterize defendant's statements 38 times throughout prosecutor's closing and rebuttal. Lastly, prosecutorial vouching undermines the factfinding function of the jury and defendant's constitutional right to a fair trial by encouraging the jury to resolve the issues on an improper basis. Thus, given defendant's strong liberty interest at stake, the gravity of error, and the importance of defendant's right to a fair trial, we exercise our discretion to correct the error and reverse and remand.

Because they are likely to come up again on remand, we also address several of the defendant's other assignments of error.

B.  *Motion to Sever Animal Abuse Charge*

Defendant argues that the trial court erred by deny-ing defendant's motion to sever the animal abuse charge (Count 1) from the counts of abuse against M (Counts 2-16). We are unpersuaded by defendant's argument because the charges were properly joined, and defendant has not met his burden of showing that he was substantially prejudiced.

ORS 132.560(1)(b)(C) allows for joinder of offenses "[b]ased on two or more acts or transactions connected together or constituting part of a common scheme or plan." Joinder is intended to be construed broadly. *State v. Dewhitt*, 276 Or App 373, 382, 368 P3d 27, *rev den*, 359 Or 667 (2016). We have previously determined that if the crimes were investi-gated together, if they involve the same witnesses, and if they occurred at the same time and in the same place, those con-siderations go to the totality of the circumstances when deter-mining whether charges are sufficiently "connected together." *Id*. at 385-86. Here, the evidence of animal abuse and the evidence of physical and sexual abuse were uncovered during the same investigation, the animal abuse occurred within the same time period that the sexual abuse occurred, and both occurred at defendant's home. Additionally, K, M, and Officer Murray were witnesses in both cases. That was enough to establish that permissive joinder was proper in this case.

Defendant further argues that the denial of his motion to sever the charges caused him unfair substantial prejudice. We disagree.

To show that denying a motion to sever substan-tially prejudiced defendant, he must show that the joinder impeded his right to a fair trial. *State v. Delaney*, 370 Or 554, 566, 522 P3d 855 (2022). The Supreme Court has iden-tified several ways joinder might harm that right, including, as relevant here, that a jury could conclude that because defendant was guilty of one crime, he was guilty of another. *Id*. at 571. However, because the statute is intended to be broadly construed in favor of joinder, defendant must make a "case specific" showing of this kind of prejudice beyond the inherent possibility of propensity reasoning that comes with joining two unrelated crimes and the jury being exposed to

evidence that may not have been cross-admissible in separate trials. *Id.* at 567-68.

Here, defendant has not demonstrated that he experienced prejudice beyond that inherent in joining two unrelated crimes, which our jurisprudence has, to this point, allowed. *See, e.g., id.* Defendant claims that there was substantial prejudice because the jury, upon hearing the "gruesome" details of the animal abuse case, might have engaged in improper propensity reasoning. Defendant specifically argues that even if the general facts surrounding the investigation of Blue's death came in as background to give context to M's disclosure, OEC 403 would not permit the trial court to admit the substantive details of animal abuse. However, the prejudice defendant argues that joinder caused—that the jury could get caught in a feedback loop of thinking that someone who abused an animal in this way was the kind of person who would sexually abuse his child and also that someone who sexually abused his child was the kind of person who would abuse an animal—did not go beyond that prejudice inherent in joining two unrelated violent crimes. *Cf. State v. Hernandez-Esteban*, 374 Or 300, 322-23, 577 P3d 761 (2025) (holding that defendant provided a case-specific theory of prejudice by arguing that there was a substantial risk of the jury using the stronger evidence of sex abuse against one victim to "fill gaps in evidence" by "sexualizing defendant's contact" with the second victim, and thus decide the case against the second victim on impermissible propensity grounds).

C. *Admittance of Adult Daughter's Testimony Under OEC 403*

Defendant argues that the trial court erred by not excluding his adult daughter's testimony under OEC 403 because the unfair prejudice substantially outweighed its probative value. We are not persuaded by that argument because the evidence, while prejudicial, was admitted to refute a specific part of defendant's theory of the case and the court provided the jury with a limiting instruction.

"Under OEC 403, relevant evidence may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice." *State v. Davis*, 372 Or 618,

641, 553 P3d 1017 (2024) (internal quotation marks omitted). "Evidence is unfairly prejudicial if it improperly appeals to the preferences of the trier of fact for reasons that are unrelated to the power of the evidence to establish a material fact." *Id*. at 634 (internal quotation marks omitted). OEC 403 is a discretionary standard, which we review for abuse of discretion. Thus, the relevant inquiry is whether admitting the evidence was among legally permissible outcomes. *See id*. at 641.

Here, when ruling that OEC 403 did not bar defendant's adult daughter's expected testimony about the shape of defendant's penis, the trial court evaluated both the risk of unfair prejudice and the probative value, ultimately concluding that the probative value was high enough that it was not substantially outweighed by the risk of unfair prejudice. The court acknowledged that defendant's adult daughter's testimony carried a risk of unfair prejudice, noting that the testimony implied circumstances in which defendant had sexual contact with that witness, his now-adult daughter, when she was around the same age as the alleged victim in this case. The court additionally acknowledged that the testimony was about defendant's penis shape 20 years ago. However, it also weighed the probative value of the evidence and determined that it was highly probative because the defense had made defendant's penis shape a central issue, and the only other witness that the state called to testify that defendant did not have a penis deformity was K, whose credibility the defendant had extensively tried to impeach.

Additionally, the state and court took steps to mitigate the danger of unfair prejudice. The state limited its questions and phrased them narrowly, which constrained the evidence to the following exchange:

"[THE STATE:]   Ma'am, have you ever seen with your eyes the defendant's erect penis?

"[WITNESS:]   No.

"[THE STATE:]   Have you ever felt his erect penis with your hand?

"[WITNESS:]   Yes.

"[THE STATE:]   Is that about 20 years ago?

"[WITNESS:]   Yes.

"[THE STATE:]   Did it have any sort of bend or curvature to it?

"[WITNESS:]   No."

The court also delivered a limiting instruction before the state elicited the testimony, which instructed the jury that "any testimony regarding the shape of [defendant's] penis may be considered only for the limited purpose of whether or not his penis did or did not have the curvature described by the other witnesses and for no other purpose."

Given the court's thorough consideration of both the danger of unfair prejudice and the probative value, along with its efforts to limit the potential for harm through its limiting instruction, we cannot say that the court abused its discretion when it admitted defendant's adult daughter's testimony.

D.   *Mother's Collateral Testimony*

Defendant contends that the trial court erred by allowing defendant's mother to testify and impeach his statement that she signed him up for the military because that statement concerned a collateral matter. *See State v. Guzek*, 342 Or 345, 359, 153 P3d 101 (2007) (holding a witness may not be impeached as to a merely collateral matter). We conclude that defendant did not preserve that assignment of error because defendant had objected to his mother's testimony only on the theory that it improperly used specific instances of conduct, which are impermissible under OEC 608(2). Because we are remanding on a different assignment of error and defendant will have the opportunity to object to the collateral testimony if it arises again, we decline defendant's request for plain error review on that assignment.

E.   *Merger of Counts 5, 6, 7, 9, and 11*

Defendant contends that the trial court erred in failing to merge the guilty verdicts for Counts 5, 6, 7, 9, and 1. Because we reverse and remand those convictions and the record may develop differently in a new trial, we do not reach the merger issue.

Convictions on Counts 1 through 12 and 14 through 16 reversed and remanded; otherwise affirmed.